UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTOTECH TECHNOLOGY
DEVELOPMENT, INCORPORATED,

                     Plaintiff,                           Case Number 23-10357

v.                                                 Honorable David M. Lawson

CARBOPRESS, SPA,

                     Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff AutoTech Technology Development, Inc. represents parts suppliers by marketing their products to motor vehicle manufacturers. This case concerns sales commissions that AutoTech contends defendant CarboPress, S.p.A. owes it after the dissolution of the parties' representation agreement. Their contract includes provisions for the payment of commissions for a fixed period after the agreement is terminated. AutoTech filed an amended complaint that pleads counts for breach of contract and violations of Michigan's Sales Representative Act, as well as alternate theories of recovery. CarboPress moves for judgment on the pleadings, arguing that AutoTech breached the agreement and thereby forfeited any commissions owed, and that the amended complaint and the attached representation agreement demonstrate as a matter of law that the commissions AutoTech seeks fall outside the window established for its post-termination obligations. However, a reasonable reading of the agreement suggests otherwise, and the contract and statutory counts of the amended complaint state plausible claims for relief. The allegation of AutoTech's antecedent breach presents a fact dispute that cannot be resolved at this stage of the case. Nonetheless, AutoTech's alternate theories of liability are not well pleaded, and they will be dismissed. The motion will be granted in part and denied in part.

I.

AutoTech is a Michigan corporation providing sales representative services in the auto industry.  CarboPress is an Italian corporation that manufactures automotive parts.  Its customers include original equipment manufacturers (OEMs), such as General Motors.  In 2017, AutoTech and CarboPress entered into a sales representative contract under which AutoTech would represent CarboPress and market its parts.  Per their agreement, AutoTech was to receive commissions of either four or eight percent of CarboPress's North American sales, depending on the type of buyer.

AutoTech alleges that it worked diligently to secure business for CarboPress, with considerable success, and that the relationship went smoothly for several years.  However, relations began to sour, and on July 13, 2022, it received a letter from CarboPress, dated June 29, 2022, which mentioned a "termination letter for our Sept. 1, 2017 Representation Agreement" that supposedly was sent but never received, and stated that "[i]t is understood that until the termination of the agreement both parties will have to fulfill all the undertaken contractual obligations."  Am. Compl., Ex. 2, ECF No. 16-3, PageID.166.  The letter went on to state that CarboPress "remain[s] at your disposal should you wish to negotiate the terms of a new and improved relationship."  *Ibid.* On January 12, 2023, CarboPress sent another letter, accusing AutoTech of violating the contract by attempting to form a relationship with a competing manufacturer as early as September 2021.  Am. Compl., Ex. 3, ECF No. 16-4, PageID.168.  CarboPress stated that this conduct constituted grounds for immediate termination of the agreement.  *Ibid.*

AutoTech avers that no such breach occurred and that the contract required a cure period anyways.  It also maintains that both letters were insufficient to effectuate a termination of the contract.  In fact, on February 10, 2023, AutoTech sent CarboPress a letter notifying it that the termination attempts constituted a breach of the parties' contract and provided an opportunity for

it to cure.  Am. Compl., Ex. 4, ECF No. 16-5, PageID.169-77.  AutoTech alleges that General Motors, and perhaps other customers, began making payments to CarboPress after the "second half" of 2022 to which it had a claim for commissions.  However, CarboPress refused to pay AutoTech the commissions it was owed.  AutoTech also avers that the term of the agreement continues through August 31, 2026, and it is now owed commissions until then as well.

The parties' present dispute principally turns on the interaction among several contractual provisions governing the term and termination of the agreement.  The relevant provisions of the contract state:

> AutoTech will act as exclusive sales representative for CARBOPRESS for the sale of Technology and Component Sales to the exclusive accounts for an initial term commencing on September 1, 2017 and ending on August 31, 2020.
>
> On September 1 of each year commencing September 1, 2018 the term of this Agreement will be extended for one additional year unless either party gives written notice to the other, at least 60 days prior to that date, that the one year extension will not occur. This Agreement shall not be terminated before the expiration of the initial term or the extended term unless both AutoTech and CARBOPRESS agree in writing to such termination, or a party terminates this agreement because the other party has breached its obligations under this Agreement. If there is a breach, a party must first give written notice of the breach to the other party and give the party in breach 30 days to cure the breach. If the other party fails to cure the breach within 30 days, then the other party may terminate this agreement by giving an additional 30 days written notice of termination. **Notwithstanding the above, either party may cancel this Agreement during the first twelve months of the initial term of this Agreement upon sixty-days written notice.**
>
> Upon expiration or termination of AutoTech's representation for any reason other than a breach by AutoTech of its obligations under this agreement AutoTech will be paid commissions as required by Paragraph 2 on all CARBOPRESS sales to the exclusive accounts arising from new business for the life of all contracts entered in to or quoted by CARBOPRESS prior to the date of expiration.
>
> Furthermore, the parties agree that AutoTech will be paid commissions as required by Paragraph 2 on all CARBOPRESS sales to the exclusive accounts for contracts which are awarded within twelve months of the termination or expiration of this Agreement (hereinabove referred to as the "Tail Period") providing that there was [sic] documented sales activities prior to the termination or expiration date. Within 30 days of expiration or termination of this agreement AutoTech will provide documentation of all contracts under development which could possibly be

awarded during the subject Tail Period. Contracts are considered "awarded" by a signed license agreement, purchase order, early source designation or other written documentation from the customer constituting customer's binding commitment to license or purchase.

Am. Compl., Ex. 1, ECF No. 16-2, PageID.163-64 (emphasis in original).

AutoTech filed its complaint on February 9, 2023, pleading thirteen counts, all related to CarboPress's alleged failure to pay commissions. The complaint languished on the Court's docket for more than eight months while AutoTech attempted to effectuate service on the defendant in Italy. This task finally was completed last year in mid-October, and the defendant thereafter filed a motion to dismiss. The plaintiff filed an amended complaint, consolidating and reducing its claims to five counts: breach of contract (Count I), violation of the Michigan Sales Representative Act (Count II), breach of fiduciary duty (Count III), the "procuring cause doctrine" (Count IV), and implied contract, unjust enrichment, quantum meruit, quasi contract (Count V). That filing mooted CarboPress's previous motion to dismiss, so it filed an answer to the amended complaint and a motion for judgment on the pleadings. The Court heard oral argument on the motion on May 29, 2024.

## II.

The main thrust of CarboPress's motion is directed at the breach of contract claim. It contends that the documents attached to the complaint conclusively show that CarboPress properly invoked the contract's termination provision by plainly informing AutoTech that the contract would not be extended beyond 2022, and that it also later terminated the contract in January of 2023 due to concerns that AutoTech was representing a competitor as early as 2021. It reasons that because the agreement voided AutoTech's right to commissions in the event of a breach, AutoTech cannot show it is entitled to any commission payments and that the complaint's allegations to the contrary cannot be credited. It also contends that because the agreement was

terminated effectively in 2022, AutoTech cannot plausibly plead that it has a right to commissions during the 12-month follow-on period.   CarboPress adds that the complaint fails to allege specifically what commissions are due.

AutoTech counters that CarboPress misreads the termination language in the contract, which established an initial three-year term that was extended annually by a year automatically unless a party gave notice of termination.   It contends that each year since 2018, because CarboPress did not provide the requisite notice, the agreement's term was extended by an additional year.   It maintains that the agreement's term ran through 2024 at the time CarboPress sent its purported non-renewal letter in 2022.   AutoTech adds that this letter could not end the contract because it did not mention a non-extension of the contract and was not timely received. Nor does AutoTech believe that CarboPress's January 2023 purported termination of the agreement was effective as the contract requires the non-breaching party to provide a 30-day opportunity to cure and a second notice of termination — neither of which occurred.   Moreover, AutoTech adds that the complaint specifically alleged that it *had not* breached the contract and that CarboPress's claims to the contrary suggest fact questions that cannot be resolved at this stage of the proceedings.

CarboPress appropriately brought its motion under Federal Rule of Civil Procedure 12(c) since it has answered the amended complaint and the pleadings are closed.   A motion under that rule invokes the same standards that govern motions to dismiss filed under Rule 12(b)(6).   *See* Fed. R. Civ. P. 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001).   When evaluating a motion under Rule 12(b)(6), the Court is called upon to determine if the "complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951-52 (6th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).  When reviewing the motion, the Court "must construe the complaint in the light most favorable to the plaintiff and accept all [factual] allegations as true."  *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)).

When deciding a motion under Rule 12(b)(6) or Rule 12(c), the Court looks only to the pleadings, *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010).

## A.

To state a claim for breach of contract under Michigan law, a plaintiff first must establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453 N.W.2d 304, 307 (1990).  A valid contract is formed when there are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58, 60 (1991).  Once a valid

contract has been established, the plaintiff then must prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff resulting from the breach. *Lossia v. Flagstar Bancorp Inc.*, 895 F.3d 423, 428 (6th Cir. 2018) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 296 Mich. App. 56, 71, 817 N.W.2d 609, 619 (2012)).

The parties do not dispute that a contract — the representation agreement — existed between them.  AutoTech alleges that CarboPress breached terms of the agreement by refusing to make payments owed during the second half of 2022, Am. Compl. ¶ 37, and improperly attempted to terminate the agreement, *id.* ¶ 41.  AutoTech also alleges that it suffered damages in the form of lost commissions due to CarboPress's breach.  *Id.* ¶¶ 53-60.  CarboPress offers several explanations for why the allegations and documents attached to the complaint conclusively demonstrate that it did not breach the terms of the contract.  However, at this stage of the proceedings, when all of the plaintiff's factual allegations must be taken as true, its arguments all point to issues better addressed after discovery than via judgment on the pleadings.  One exception to that general rule can be found in some Sixth Circuit cases that allow reference to evidence attached to or referenced in the pleadings which "'blatantly contradict[s];' or 'utterly discredit[s]'" the plaintiff's allegations.  *See Bell v. City of Southfield, Michigan*, 37 F.4th 362, 364 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  CarboPress insists that the representation agreement furnishes that evidence, because it shows that the contract was not in force after August 31, 2022.

To assess that argument, let us look again at the contract language that defines its termination and the process for termination.

> AutoTech will act as exclusive sales representative for CARBOPRESS for the sale of Technology and Component Sales to the exclusive accounts for an initial term commencing on September 1, 2017 and ending on August 31, 2020.

- 7 -

> On September 1 of each year commencing September 1, 2018 the term of this Agreement will be extended for one additional year unless either party gives written notice to the other, at least 60 days prior to that date, that the one year extension will not occur.

Contract, ECF No. 16-2, PageID.163-64.  By CarboPress's reading of the agreement, the contract established an "initial" three-year term, after which it would automatically renew for subsequent one-year periods unless one of the parties gave the requisite non-renewal notice 60 days in advance—i.e., by July 3.  No one contends that a non-renewal notice was given before 2022.  But CarboPress avers that it did so in 2022 by mailing its letter on June 29, 2022, and that the contract therefore expired on August 31, 2022.

AutoTech reads the agreement differently.  It argues that when no termination notice was received in 2018, the agreement's term was extended by one year to August 31, 2021.  This extension continued each year, and by 2021, the term of the agreement had been extended to 2024.  AutoTech asserts that CarboPress's letters were not effective non-renewal notices, so the agreement still has not been terminated and now runs through 2026.

CarboPress takes issue with this reading, arguing that it disregards the distinction between the phrase "initial term" in the first sentence and the word "term," standing by itself, in the second.  It also maintains that AutoTech's interpretation leads to an absurd result where a party that waited until the end of the initial term to decide whether to renew the agreement would be forced to bear an agreement that by then would have doubled in length.  The Court disagrees with each of these arguments.

Contract interpretation is a question of law for the court, unless there is an ambiguity.  *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 408, 646 N.W.2d 170, 174 (2002); *Zwiker v. Lake Superior State Univ.*, 340 Mich. App. 448, 474, 986 N.W.2d 427, 441 (2022).  "The relevant contract interpretation principles are simple enough — courts should enforce contract

language in accordance with its plain and commonly used meaning, being careful to enforce specific and well-recognized terms," and the "contract should be read as a whole instrument and with the goal of enforcing the intent of the parties." *Whitehouse Condo. Grp., LLC v. Cincinnati Ins. Co.*, 569 F. App'x 413, 416 (6th Cir. 2014) (citing *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 354, 596 N.W.2d 190, 193-94 (1999); *Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340, 1350 (6th Cir. 1996)).

The plain language of the agreement supports AutoTech's position.  The agreement establishes an initial term beginning September 1, 2017 that runs for three years, ending on August 31, 2020.  It then states that on "September 1 of each year *commencing September 1, 2018*[,] the term of this Agreement" would be extended by an additional year unless a timely notice is received "at least 60 days prior to that date."  Contract, ECF No. 16-2, PageID.163 (emphasis added).  In other words, the contract's termination date would always lead by three years from the start in 2017 unless one of the parties took action to forestall the automatic extensions.  Considering the type of work performed by the sales representative, that makes sense.  In the automotive industry, it takes time to cultivate an account, negotiate engineering details, arrange for the production of parts that meet specifications, and see the deliveries through a production cycle.  AutoTech apparently sought to negotiate enough lead time into the agreement so that it could complete an account without the concern that its client could terminate the contract before the commissions would start to flow.

The parties agree that 2018, 2019, 2020, and 2021 all came and went without any attempt to cancel the automatic extensions.  Beginning in September of 2018, the term of the agreement therefore reset to 2021, 2022, 2023, and 2024, respectively.  CarboPress argues that this reading renders the phrase "initial term" surplusage, but that argument ignores the basic structure of the

automatic extension and notice provisions.  If no notice is given after the first year, that is, "commencing September 1, 2018," the "initial term" is extended, and a "new" three-year term becomes effective with an expiration date one year after the "initial term" would have ended.

CarboPress advocates for a construction of the agreement that would have expired on August 30, 2020 and then renewed automatically thereafter (absent cancellation notice) for one-year increments.  A contract of that sort likely would make some sense, allowing a shorter window for both parties to determine whether they wished to maintain their contractual relationship for the following year.  But that is not what the contract says.  And although a contract generally is to be interpreted to avoid absurd results, *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 286 Mich. App. 287, 297, 778 N.W.2d 275, 281 (2009), the construction posited by AutoTech is equally reasonable.  Both parties could benefit from the contract's significant protection against a relatively sudden choice by the other to end the contract.  The parties' agreement is not ambiguous, and the parties must be held to their bargain.

Even if the Court were to find the language ambiguous, that would not help CarboPress. At the motion to dismiss stage the Court must resolve all ambiguities in the contract in the plaintiff's favor.  *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012).  "In other words, '[t]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.'" *Ibid.* (quoting *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992)); *see also Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 503 (6th Cir. 2014) (affirming denial of motion to dismiss where contract language was ambiguous); *Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 (2003) ("It is well settled that the meaning of an ambiguous contract

is a question of fact that must be decided by the jury."); *Franklin Cap. Funding, LLC v. Austin Bus. Fin., LLC*, 676 F. Supp. 3d 515, 525-26 (E.D. Mich. 2023).

Accepting all of the plaintiff's factual allegations as true, the amended complaint adequately pleads a breach of contract claim.  AutoTech's reading suggests that in June of 2022, the contract would end on August 31, 2024 at the earliest.  The Court need not determine at this stage of the case the effect of CarboPress's June 2022 letter on the automatic extension provision. The letter would have, at most, announced that the contract would not have been renewed into a term covering 2025.  The parties would remain in a contractual relationship until then, and commissions would remain due under the contract.  Considered with AutoTech's allegations that it has not been paid since at least "the second half of 2022," Am. Compl. ¶ 37, and that it informed CarboPress of the deficiencies, provided an opportunity for a cure, and still has not received payment, *id.* ¶ 40, it has alleged facts to state a claim.

CarboPress's remaining arguments do nothing to change that result.  It primarily argues that its January 2023 termination notice, which the plaintiff attached to the complaint, establishes conclusively that AutoTech breached the agreement as early as September of 2021 by forming a relationship with a direct competitor.  Because the contract bars AutoTech from receiving post-termination payments when it has breached the agreement, CarboPress contends that AutoTech cannot show it is entitled to any payments.  This argument is unpersuasive for a few reasons.  First, contrary to CarboPress's assertion, the contract does not clearly foreclose AutoTech from receiving post-termination commission payments for accounts where it has documented sales activity.  Although the agreement does provide that a breach of the contract by AutoTech prevents it from receiving commissions for the life of then-existing contracts, the provision governing AutoTech's entitlement to commissions on sales accounts awarded during the Tail Period does not

include similar limiting language.  Second, and importantly, AutoTech alleges that it did not breach the contract, Am. Compl. ¶ 52, creating a fact dispute that must be resolved in the plaintiff's favor at this stage of the proceedings.  Its decision to attach CarboPress's January 2023 letter to the complaint does not contradict that position.  At most, the letter suggests that CarboPress believed AutoTech breached the contract, not that it actually did.  *See Jones*, 521 F.3d at 561 (stating that "[w]here a plaintiff attaches to the complaint a document containing unilateral statements made by a defendant," the exhibit is an allegation that the defendant made the statement, not that the statement is true).  As such, the letter provides no support for CarboPress's argument that AutoTech engaged in misleading conduct in violation of the agreement.

CarboPress follows up by arguing that AutoTech's complaint is deficient because it does not identify whether the alleged accounts with General Motors were in place before August 31, 2022, rather than accounts awarded during the following year for which there were documented sales activities.  But again, these arguments are based on CarboPress's misbegotten belief that the agreement conclusively would have terminated on August 31, 2022.  Instead, the pleadings describe with sufficient clarity the nature of the commissions AutoTech seeks.

The motion to dismiss Count I of the amended complaint will be denied.

### B.

CarboPress also argues for dismissal of Count II of the amend complaint, which pleads a claim under the Michigan Sales Representative Act, Mich. Comp. Laws § 600.2961.  That statute renders a principal that fails to timely pay commissions when due under the parties' contract liable for actual damages, or, if acting intentionally, "2 times the amount of commissions due but not paid as required by this section or $100,000.00, whichever is less."  Mich. Comp. Laws §

600.2961(5)(b). The Act provides further remedies to a sales representative. *See id.* at §
600.2961(4), (6).

Both parties concede that the plaintiff's claim in this count depends on the viability of the
plaintiff's breach of contract claim. *See Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759,
766 (6th Cir. 2009) (per curiam) ("[I]f there is no liability on the contract claim for sales
commissions, there is no corresponding violation of the Act."). Because the breach of contract
claim is well pleaded, this count survives the motion to dismiss as well.

## C.

CarboPress contends that Count III, the breach of fiduciary duty claim, must be dismissed
as well. To establish a claim for breach of fiduciary duty under Michigan law, the plaintiff must
plead facts that show "(1) the existence of a fiduciary duty, (2) a breach of that duty, and (3)
damages caused by the breach of duty." *Highfield Beach at Lake Michigan v. Sanderson*, 331
Mich. App. 636, 666, 954 N.W.2d 231, 247 (2020) (citations omitted). A fiduciary relationship
"arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment
and advice of another." *Teadt v. Lutheran Church Missouri Synod*, 237 Mich. App. 567, 580-81,
603 N.W.2d 816, 823 (1999). "A person in a fiduciary relation to another is under a duty to act
for the benefit of the other with regard to matters within the scope of the relation." *Id.* at 581, 603
N.W.2d at 823 (citing *Melynchenko v. Clay*, 152 Mich. App. 193, 197, 393 N.W.2d 589 (1986)).
A breach of fiduciary duty arises when a person holding a position of influence and confidence
"abuses the influence and betrays the confidence." *Highfield Beach*, 331 Mich. App. at 666 n.13,
954 N.W.2d at 247 (citing *Teadt*, 237 Mich. App. at 581, 603 N.W.2d at 823).

CarboPress asserts that the plaintiff's breach of fiduciary duty claim must fail because the
parties engaged in an arms-length commercial transaction, which by its nature does not give rise

to any fiduciary duty between the parties. AutoTech asserts that it has pleaded sufficient content to support the existence of a fiduciary duty where it has alleged that the parties are separated geographically by more than 4,000 miles, that it cannot monitor commission payments on a day-to-day basis, that CarboPress repeatedly stated that it would account for and pay commissions, and that CarboPress mismanaged and misappropriated funds. The defendant has the better argument.

An action for breach of fiduciary duty sounds in tort. *Highfield Beach*, 331 Mich. App. at 666, 954 N.W.2d at 247 (citing *Miller v. Magline, Inc.*, 76 Mich. App. 284, 313, 256 N.W.2d 761 (1977)). "The law in Michigan is well-settled that an action in tort requires a breach of duty separate and distinct from a breach of contract." *Brock v. Consol. Biomedical Labs.*, 817 F.2d 24, 25 (6th Cir. 1987) (citing *Haas v. Montgomery Ward & Co.*, 812 F.2d 1015 (6th Cir. 1987)). "'[I]f a relationship exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not.'" *Haas*, 812 F.2d at 1016 (quoting *Hart v. Ludwig*, 347 Mich. 559, 565, 79 N.W.2d 895, 898 (1956)). It also is well-established that in Michigan "a plaintiff '[may] not maintain an action in tort for nonperformance of a contract.'" *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (quoting *Ferrett v. Gen. Motors Corp.*, 438 Mich. 235, 242, 475 N.W.2d 243, 247 (1991)). "In some cases a breach of contract may give rise to an independent tort action, but only where there is a breach of a duty that is distinct from the breach of contract." *Oak St. Funding, LLC v. Ingram*, 511 F. App'x 413, 418 (6th Cir. 2013) (citations omitted). "Where the only allegation is of a defective performance of obligations imposed by contract, the proper cause of action lies in contract, not in tort." *McLaren Reg'l Med. Ctr. v. CompleteRX, Ltd.*, No. 16-14268, 2017 WL 3034615, at *8 (E.D. Mich. July 18, 2017) (citing *Loweke v. Ann Arbor Ceiling & Partition Co.*, 489 Mich. 157, 166, 809 N.W.2d 553, 558 (2011)).

Other courts have held similarly.  *See, e.g.*, *Revelation Yogurt, LLC v. Kline L. Grp., P.C.*, No. 20-11195, 2021 WL 1812694, at *2 (E.D. Mich. May 6, 2021).

Still, the separate and distinct analysis "generally does not necessarily involve reading the contract, noting the obligations required by it, and determining whether the plaintiff's injury was contemplated by the contract."  *Loweke*, 489 Mich. at 169, 809 N.W.2d at 560.  Rather, the "threshold question" of the separate and distinct inquiry is "whether the defendant owed the plaintiff any legal duty that would support a cause of action in tort, including those duties that are imposed by law."  *Id.* at 171, 809 N.W.2d at 561; *see also Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross & Blue Shield of Michigan*, 391 F. Supp. 3d 706, 716-17 (E.D. Mich. 2019).

AutoTech has not pleaded facts that establish a legal duty apart from CarboPress's contractual obligations.  In Michigan, "a fiduciary duty cannot exist where the interests of the party are adverse."  *German Free State of Bavaria v. Toyobo Co., LTD*, 480 F. Supp. 2d 958, 966 (W.D. Mich. 2007) (citing *Beaty v. Hertzberg & Golden, P.C.*, 456 Mich. 247, 571 N.W.2d 716, 722 (1997)).  This is because a party's repose of trust in the other — a prerequisite to a fiduciary relationship — must be reasonable.  *Rose v. Nat'l Auction Grp., Inc.*, 466 Mich. 453, 469, 646 N.W.2d 455, 464 (2002).  Courts have recognized that the typical setting of an arms-length commercial transaction is incompatible with a reasonable repose of trust in the counter-party to a contract.  *See Ford Motor Co. v. Ghreiwati Auto*, 945 F. Supp. 2d 851, 866 (E.D. Mich. 2013) (collecting cases); *Ulrich v. Fed. Land Bank of St. Paul*, 192 Mich. App. 194, 199-200, 480 N.W.2d 910, 913 (1991) (determining that no fiduciary duties existed where the facts alleged by the plaintiffs primarily concerned a commercial transaction); *Bero Motors v. Gen. Motors Corp.*, No. 224190, 2001 WL 1167533, at *5 (Mich. Ct. App. Oct. 2, 2001) ("Plaintiff's mere expression that

it relied on GM . . . is unconvincing against a commercial backdrop where sophisticated commercial entities, such as here present, regulate the minutiae of their relationship through written contracts."); *Waun v. Universal Coin Laundry Mach., LLC*, No. 267954, 2006 WL 2742007, at *9 (Mich. Ct. App. Sept. 26, 2006) (finding no fiduciary duty between the parties where the defendants' ultimate goal was to sell equipment to the plaintiff and they had merely a "contractual business transaction").

AutoTech's allegations in Count III of the amended complaint state that because CarboPress was located thousands of miles away in Italy and conducted its business directly with the customers that AutoTech had procured, AutoTech justifiably relied on CarboPress to account accurately for its sales revenue and to pay the proper amount of commissions.  It cites *Smith v. Saginaw Savings & Loan Association*, 94 Mich. App. 263, 288 N.W.2d 613 (1979) (per curiam) to buttress that argument.  However, that case is distinguishable.

In *Smith*, the plaintiffs obtained a $25,000 construction loan from defendant Saginaw Savings to build a house.  They deposited the loan proceeds and some money of their own into a "Due Borrower's Account" at Saginaw Savings, from which their building contractor could take draws for completed work.  *Smith*, 94 Mich. App. at 266, 288 N.W.2d at 615.  Saginaw Savings undertook to send its own employee to inspect the work on site before releasing the draws, a task for which it charged the plaintiffs a fee.  The plaintiffs had no contact with the inspector; the only person they dealt with was Saginaw Savings's branch manager, Eugene Sauer.  "Sauer personally approved the builder and the building agreement signed by the Smiths." *Id.* at 267, 288 N.W.2d at 615.  He also approved the building specifications. *Id.* at 275, 288 N.W.2d at 618.  Sauer "assured [the plaintiffs] that sufficient funds to complete the house would always be in the Due Borrower's Account" and that Saginaw Savings "would make certain that any work claimed by [the builder]

to have been completed was actually done prior to the release of any payment to [the builder] and that all required waivers of lien would be obtained." *Id.* at 266-67, 288 N.W.2d at 615. The plaintiffs could not supervise the building project themselves because of their medical issues and the distance from their dwelling. *Id.* at 266, 288 N.W.2d at 615, 618. "The [plaintiffs] . . . stated that they had placed complete trust and confidence in Sauer and relied upon his judgment regarding the builder and the agreement with him as well as Sauer's representations regarding the quality and the progress of the construction." *Id.* at 267, 288 N.W.2d at 615. After construction started, Sauer learned that the builder had encountered "severe financial difficulties," but he kept that information from the plaintiffs. *Ibid.* Sauer did not do anything to protect the plaintiffs' interests in the home or the loan proceeds, but, as it turned out, he was having a home constructed by the same builder, and he took action to cover himself. *Ibid.* Under these unique facts, the Michigan Court of Appeals held that the plaintiffs "plainly established the existence of a fiduciary obligation [on the part of Saginaw Savings] and the breach thereof." *Id.* at 275, 288 N.W.2d at 618.

These same facts, however, demonstrate why *Smith* does little for the plaintiff here. Of critical importance to the court's decision in *Smith* was the particularly vulnerable set of plaintiffs. And while the parties in that case were bound by the terms of the mortgage, the evidence suggested that Sauer acted beyond the scope of that contract as an "emissary" between the plaintiffs and the home builders. *Ibid.* Unlike the plaintiffs in *Smith*, AutoTech has not alleged any circumstances suggesting that it was anything other than a sophisticated commercial enterprise engaged in an arms-length transaction. And though the parties here are separated by an ocean, AutoTech has not alleged any facts suggesting that it was weak, easily dominated, or that CarboPress made commitments outside the four corners of its contract.

- 17 -

The plaintiff has not stated a viable claim for breach of fiduciary duty in Count III of the amended complaint.  That count will be dismissed.

D.

CarboPress argues that AutoTech cannot maintain a procuring cause claim because that theory is not a recognized cause of action, and any such claim is inapt where the parties have a written sales agreement governing post-termination allocations.

In Michigan, "'sales agents are entitled to post-termination commissions for sales they procured during their time at the former employer.'"  *KBD & Assocs., Inc. v. Great Lakes Foam Techs., Inc.*, 295 Mich. App. 666, 673, 816 N.W.2d 464, 468 (2012) (quoting *Stubl v. T. A. Sys., Inc.*, 984 F. Supp. 1075, 1095 (E.D. Mich. 1997)).  The doctrine, which is based on notions of fair dealing and preventing the injustice that would occur if a principal could cancel a sales contract to avoid paying commissions, "applies when the parties have a contract governing the payment of sales commissions, but the contract is silent regarding the payment of posttermination commissions."  *Id.* at 673, 675, 816 N.W.2d at 468-69.

CarboPress is correct that some cases hold that the "procuring cause" doctrine is not in itself a cause of action. *See Weston & Co. v. Vanamatic Co.*, No. 08-10242, 2008 WL 2266319, *4 (E.D. Mich. June 3, 2008) (noting that the "Procuring Cause Doctrine" is not itself a cause of action but construing the complaint to assert a breach of contract claim based on that theory).  The cases AutoTech cites in response do not definitively characterize the doctrine as a cause of action inasmuch as they fail to consider the issue.  *See, e.g.*, *King v. Triton Indus., Inc.*, No. 1:08-cv-1006, 2009 WL 4639334, *11-14 (W.D. Mich. Dec. 2, 2009) (holding that the defendant was entitled to summary judgment on a procuring cause claim because the plaintiff failed to provide evidence that he procured any sale); *McFeely v. Seneca Wire & Mfg. Co.*, No. 07-10596, 2008 WL 2355602, *6

- 18 -

(E.D. Mich. June 5, 2008) (deciding the plaintiff was entitled to post-termination commissions on any sales for which he was the procuring cause because the parties' agreement was silent as to the plaintiff's right to post-termination commissions).  Both parties cite cases describing the doctrine an "equitable remedy."  *See J.R. Davis Co., Inc. v. Jacobson Mfg., LLC*, No. 15-10066, 2015 WL 5590677, at *3 (E.D. Mich. Sept. 22, 2015); *Bailey v. Fast Model Techs., LLC*, No. 10-15118, 2012 WL 2601882, *3 (E.D. Mich. July 5, 2012).

Whether the concept of procuring cause is a discrete cause of action under Michigan law need not be resolved here.  Even if it is, AutoTech cannot avail itself of that theory, because an agent "may only obtain an award as the procuring cause of post-termination sales where the written agreement is silent." *APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 616 (6th Cir. 2003) (citing *Roberts Assocs., Inc. v. Blazer Int'l Corp.,* 741 F. Supp. 650, 652 (E.D. Mich. 1990).  Here, the parties' agreement explicitly covers the allocation of commissions for post-termination sales. It states that AutoTech will be paid commissions on all sales to exclusive accounts arising from new business "for the life of all contracts entered in to or quoted by CARBOPRESS prior to the date of expiration" and "all CARBOPRESS sales to the exclusive accounts for contracts which are awarded within twelve months of the termination or expiration of this Agreement . . . providing that there was documented sales activities prior to the termination or expiration date." Am. Compl. Ex 1, ECF No. 16-2, PageID.164.  Because the contract's explicit terms govern the award of post-termination commissions and the plaintiff does not seek to invalidate the agreement, the procuring cause doctrine has no application here.

AutoTech asserts that this claim is merely pleaded in the alternative in case the contract is deemed not to address or provide for the payment of post-expiration and termination commissions. Am. Compl. ¶ 99.  But the contract plainly addresses the issue, and CarboPress acknowledged in

its answer that the agreement does provide for such commissions.  There is no basis for an "alternative remedy."

Count IV of the amended complaint will be dismissed.

E.

Finally, CarboPress argues that AutoTech's claims for implied contract, unjust enrichment, *quantum meruit*, and quasi contract are duplicative of the breach of contract claims.  AutoTech responds again that these claims are alleged in the alternative, so it is entitled to maintain them through discovery.

CarboPress is correct that a party cannot *recover* under theories of *quantum meruit*, unjust enrichment, or other implied contract theories that sound in equity when a transaction is governed by a valid contract.  *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 194, 729 N.W.2d 898, 903 (2006) (holding that "an implied contract may not be found if there is an express contract *between the same parties* on the same subject matter" (quoting 42 C.J.S., Implied and Constructive Contracts, § 34, p. 33)).  But Federal Rule of Civil Procedure 8(a)(3) does permit a pleader to include "a demand for the relief sought, which may include relief in the alternative or different types of relief."  However, those alternatives generally are available only under specific circumstances, such as "when . . . there is a dispute between the parties as to whether an express agreement exists."  *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 793-94 (E.D. Mich. 2014) (citing *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426-27, 245 N.W.2d 774, 777 (1976).  "The plaintiff also may bring a breach of contract claim and an unjust enrichment claim in cases where the defendant has 'kept its options open, and may deny the existence of a contract.'" *Ibid.* (quoting *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.*, 96 F.3d 174, 182 (6th Cir. 1996).

Neither of these circumstances is present here, however.   The defendant expressly acknowledges the existence of the contract, *see* Answer, ¶ 25, ECF No. 18, PageID.187, and the plaintiff's amended complaint recognizes that the parties "entered into a very specific sales representative commission agreement," *see* Am. Compl. ¶ 25, ECF No. 16, PageID.132.   Instead, the dispute focuses on when the contract's term ended and what financial compensation AutoTech is entitled to under the agreement.   A plaintiff only may plead breach of contract and implied contract claims in the alternative if there is doubt as to the existence of a contract. *Ghreiwati Auto*, 945 F. Supp. 2d at 871. "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract.   In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract." *Advanced Plastics Corp. v. White Consol. Indus.*, Inc., 828 F. Supp. 484, 491 (E.D. Mich. 1993) (citations omitted).

The plaintiff has failed to state a viable claim in Count V of the amended complaint.

III.

Plaintiff AutoTech Technology Development, Inc. has pleaded claims for which relief can be granted in Counts I and II of the amended complaint.   Not so, however, for Counts III, IV, or V.

Accordingly, it is **ORDERED** that the defendant's motion for judgment on the pleadings (ECF No. 19) is **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Counts III, IV, and V of the amended complaint are **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
Dated:   June 26, 2024                                        United States District Judge